

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Christina A. Hoffman*
*Assistant United States Attorney*
*Christina.hoffman@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4871*
*MAIN: 410-209-4800*
*FAX: 410-962-3124*

February 13, 2020

Brendan Hurson & Maggie Grace
Office of the Federal Public Defender
100 S. Charles Street, Tower II, 9th Floor
Baltimore, MD 21201

      Re:    United States v. Cortez Weaver,
                  Criminal No. RDB-19-0144 (D. Md.)

Dear Counsel:

        This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Cortez Weaver (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by February 14, 2020, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

2.      The Defendant agrees to plead guilty to Count Two of the Superseding Indictment, which charges the Defendant with possessing, brandishing, and discharging of a firearm in furtherance of a drug trafficking crime, resulting in death, in violation of 18 U.S.C. §§ 924(j) and 924(c). The Defendant admits that the Defendant is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

3.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

#### Count Two

On or about July 17, 2017, in the District of Maryland:

1

a. the Defendant knowingly possessed and discharged a firearm;

b. the possession and discharging of the firearm was in furtherance of a drug trafficking crime for which the Defendant might be prosecuted in a court of the United States, namely, the drug trafficking conspiracy charged in Count One of the Superseding Indictment;

c. in the course of possessing and discharging the firearm, the Defendant caused the death of Maurice Finney; and

d. the killing was murder as defined in 18 U.S.C § 1111.

## Penalties

4.  The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| COUNT | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | MAX SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 2 | 18 U.S.C. §§ 924(j)/(c) | 10 years | Life or death | 5 years | $250,000 | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is

nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

### Waiver of Rights

5.     The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.     If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.     If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.     The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.     If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By

pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

6.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

7.      a.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the applicable base offense level with respect to the murder charged in Count Two is a **level 43** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2A1.1(a) because the offense was first-degree murder.

4

b. This Office and the Defendant further agree that the applicable base offense level with respect to the drug trafficking conspiracy charged in Count One (and incorporated by reference in Count Two) is a **level 32** pursuant to U.S.S.G. § 2D1.1(c)(4) because the conspiracy involved at least three kilograms but less than 10 kilograms of heroin. There is a **2-level increase** in the offense level pursuant to U.S.S.G. § 2D1.1(b)(1) because the Defendant possessed a firearm in connection with the conspiracy, for instance, on March 7, 2019. There is a further **2-level increase** in the offense level pursuant to U.S.S.G. § 2D1.1(b)(2) because the Defendant made credible threats to use violence in connection with the conspiracy, for instance, on January 25, 2019 and March 6, 2019. The adjusted offense level for the drug trafficking conspiracy is **36**.

c. This Office and the Defendant further agree that pursuant to the grouping rules in U.S.S.G. § 3D1.4, the drug trafficking conspiracy is counted as one-half unit because it is 5 to 8 levels less serious than the murder, resulting in a 1-level increase in the offense level. Accordingly, the combined offense level is **44**.

d. This Office does not oppose a **2-level reduction** in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1-level reduction** in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

8. There is no agreement as to the Defendant's criminal history, and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

9. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

10. The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of **between 300 and 360 months of incarceration in the custody of the Bureau of Prisons, followed by 5 years of supervised release,** is the appropriate disposition of this case

taking into consideration the nature and circumstances of the offense, the Defendant's criminal history, and all of the other factors set forth in 18 U.S.C. § 3553(a). This Agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this Agreement, except under the circumstances noted below, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor the Government will be bound by the specific sentence contained in this Agreement, and the Defendant will not be able to withdraw his plea.

## Obligations of the Parties

11. At the time of sentencing, this Office and the Defendant will recommend a sentence **between 300 and 360 months in the custody of the Bureau of Prisons, followed by 5 years of supervised release.** This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

12. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s).

    b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

        (i) The Defendant reserves the right to appeal the sentence of imprisonment if the total term of imprisonment **exceeds 360 months**; and

    (ii)  This Office reserves the right to appeal the sentence of imprisonment if the total term of imprisonment **is less than 300 months**.

  c.  The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Forfeiture

13. a.  The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses, including but not limited to: a Ruger .357 caliber handgun with serial number 17214226 and ammunition.

  b.  The Defendant agrees to consent to the entry of orders of forfeiture for the property described in the above subparagraphs and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

  c.  The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

  d.  The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Defendant's Conduct Prior to Sentencing and Breach

14. a.  Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

7

b. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

15. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. In the event the Court rejects this Rule 11(c)(1)(C) plea agreement, the Defendant will be informed that he may withdraw his plea pursuant to Rule 11(c)(5)(C). If he persists in the guilty plea thereafter, the Defendant understands that the disposition of the case may be less favorable than that contemplated by this agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

16. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

8

Robert K. Hur
United States Attorney

By: _____
Christina A. Hoffman
Peter J. Martinez
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

2/13/2020                            _____
Date                                 Cortez Weaver

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

2/13/2020                            _____
Date                                 Brendan Hurson, Esq.

9

## ATTACHMENT A

## STIPULATION OF FACTS

The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.

Beginning in July 2017 or earlier, the Defendant, Cortez Weaver, a/k/a "Corty," a/k/a "Tez," was a member of a conspiracy to distribute heroin and cocaine base in the Abington Avenue area of Baltimore, Maryland. In or about mid-July 2017, members of the Abington Avenue drug trafficking organization, including Christopher Hockaday, became involved in a dispute with a rival drug trafficking organization over who could sell drugs at the Sunoco gas station at the intersection of Baltimore Street and Hilton Avenue. As a result of the dispute, on July 14, 2017, a member of the rival drug trafficking organization shot and killed Hockaday in the 3200 block of Baltimore Street—the block adjacent to the Sunoco gas station.

Three days later, on July 17, 2017, the Defendant and another member of the Abington Avenue drug trafficking organization (hereinafter, "Co-Conspirator 1") went to the Sunoco gas station for the purpose of retaliating against members of the rival drug trafficking organization. At the gas station, they encountered a member of the rival drug trafficking organization named Maurice Finney, a/k/a "Mitch." The Defendant murdered Finney, shooting him in the head at close range with a .40 caliber handgun. The Defendant then attempted to murder Victim 2, chasing him across Hilton Avenue while firing multiple shots at him. Meanwhile, Co-Conspirator 1 attempted to murder Victim 3, shooting him multiple times with a 9mm caliber handgun and causing life-threatening injuries. The incident was captured by surveillance cameras at the gas station. Afterward, the Defendant sent Co-Conspirator 1 a text message directing him to "burn them clothes."

On November 13, 2018, a confidential informant (CI-1) placed a call to the Defendant that was monitored by law enforcement. During the call, CI-1 made plans to meet the Defendant to discuss a potential "lick," *i.e.*, a robbery opportunity. Soon afterward, CI-1 met with the Defendant and recorded the conversation. During the conversation, the Defendant confessed to having killed "Mitch"—*i.e.*, Maurice Finney. The Defendant described the murder using specific details that were consistent with the surveillance footage and other physical evidence recovered during the investigation. For instance, the Defendant explained that he committed the murder with "Rico" (*i.e.*, Co-Conspirator 1), that he wore a "scully cap" and "skipped down on" the victim (which is corroborated by the surveillance footage), and that he shot the victim "one time" using a "40" (which is corroborated by the physical evidence from the scene). The Defendant complained that "Rico fucked up" because he did not "put the mask on" as the Defendant had told him to do.

During the same conversation, CI-1 and the Defendant discussed the potential robbery of a drug stash house. Unbeknownst to the Defendant, the robbery opportunity was a fiction, and the

10

drug stash house did not exist. The Defendant agreed to carry out the robbery and stated that it was "the same shit" he had been doing that with a co-conspirator, another member of the Abington Avenue drug trafficking organization. The Defendant also displayed a .45 caliber firearm to CI-1 and talked about owning several firearms, including a "357" and a "40."

On January 25, 2019, CI-1 introduced the Defendant to a Baltimore Police Department undercover officer (UC-1) for the purpose of discussing the robbery opportunity. UC-1 wore an audio-video recording device to capture his interactions with the Defendant. Throughout the conversation, the Defendant repeatedly indicated that he wanted to commit the robbery. He explained that he had as many as three associates who could help him commit the robbery ("three people to run through that bitch"). He stated that he had multiple firearms, including "a big ass chopper and a lot of big 40s." He further stated that he had recently committed a similar robbery. "I just hit a lick in the city," he explained. "I ran in a nig** house and got like ten thousand and six ounces of coke." The Defendant also told UC-1 that following the robbery, he intended to "bust down," or break down, the kilogram quantities of stolen heroin into smaller components and sell the stolen heroin through his distributors.

Furthermore, at multiple points during the recorded conversation, the Defendant told UC-1 that he intended to kill the individuals who were guarding the stash location after robbing the individuals of their heroin. "Ain't tryin' to leave anybody in that bitch," the Defendant told UC-1. "Nobody coming out of there alive. Fuck no, that'll be stupid. You leave anybody in that bitch alive … all I gotta do is get in and waste 'em." Similarly, later during the conversation, the Defendant stated, "I gotta kill 'em, right; I can't leave them alone. You get what I'm saying? It's the only thing that gotta happen. Like, they can't be left alive."

On February 12, 2019, the Defendant brought two co-conspirators with him to meet UC-1 at a location in Baltimore City to discuss the robbery opportunity. UC-1 explained to the group that he was a drug trafficker who was interested in robbing his source of supply of multiple kilograms of heroin. The Defendant and his co-conspirators indicated that they were interested in assisting UC-1, discussed how the robbery would be committed, and discussed how they would resell the stolen heroin. All three asked questions or made observations regarding the logistics of the robbery. For example, a co-conspirator asked whether there were cameras in the area of the stash house where the robbery was going to take place. With respect to the individuals guarding the stash house, a co-conspirator stated, "They might gotta go. We gonna shoot niggas coming through the door." A co-conspirator observed that "the biggest problem is getting in," *i.e.*, gaining entry into the stash house.

On March 6, 2019, the Defendant and the same two co-conspirators noted in the above paragraph again met UC-1 at a location in Baltimore City to discuss the robbery opportunity. The Defendant and the UC-1 again discussed the robbery logistics. During the discussion, the Defendant described his plan to neutralize the three individuals whom he expected to be guarding the stash house. "One nigga grab him at the door," the Defendant said. "One nigga grab the nigga in the middle. The other nigga in back." A co-conspirator later added, "We ready. We ready. We already got enough artillery to do what the fuck

we said then. We gonna get in there." A co-conspirator also stated that following the robbery, he and his associates would "drop the three"—that is, they would "cut" the heroin with adulterants—before selling it in the streets. Throughout the conversation, the Defendant was listening attentively and nodding his head.

On the morning of March 7, 2019, UC-1 made plans to meet the Defendant and two co-conspirators in the parking lot of a Royal Farms in Baltimore City in order to commit the robbery. The Defendant and two co-conspirators arrived in a black Nissan Maxima drive by a co-conspirator. The Defendant exited the Nissan Maxima and accompanied UC-1 to a nearby storage facility where the group planned to split the proceeds of the robbery once it was completed. The Defendant and his co-conspirators waited in a co-conspirator's vehicle at the Royal Farms.

At the storage facility, a team of law enforcement officers approached UC-1's vehicle and placed the Defendant under arrest. During a search of the Defendant's person, the officers recovered a loaded Ruger .357 revolver, 11 pink-top vials containing suspected cocaine, and a mask. They also recovered a pair of black woolen gloves from the passenger area of UC-1's vehicle where the Defendant had been sitting.

Meanwhile, a second team of law enforcement officers approached the black Nissan Maxima in the Royal Farms parking lot and placed three co-conspirators under arrest. During searches incident to arrest, officers recovered black masks from two co-conspirators. From the rear passenger side area (where one co-conspirator had been sitting), the officers recovered a pair of black woolen gloves and a Keltec 9 millimeter handgun bearing serial number AUY36. The handgun was loaded with 10 rounds of ammunition, one of which was in the chamber. From the rear driver's side area (where another co-conspirator had been sitting), the officers recovered a pair of black woolen gloves.

The parties agree and stipulate that from at least in or about July 2017 through March 7, 2019, the Defendant conspired with one or more others to distribute heroin and cocaine base in Baltimore, Maryland, and that it was foreseeable to the Defendant that members of the conspiracy would distribute at least three kilograms but less than eight kilograms of heroin.

SO STIPULATED:

Christina A. Hoffman
Peter J. Martinez
Assistant United States Attorneys

Cortez Weaver, Defendant

Brendan Hurson, Esq.
Counsel for Defendant

12