**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Crim. No. RDB-19-144** |
| **CORTEZ WEAVER** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN AID OF SENTENCING

Mr. Weaver is before the Court for sentencing for a violation of 18 U.S.C. § 924(j), specifically the 2017 shooting death of Maurice "Mitch" Finney. The parties have entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that essentially leaves one question to be decided by the Court: is a sentence of 25 years sufficient but not greater than necessary to meet the goals of sentencing? Mr. Weaver respectfully suggests that it is.

A quarter-century in federal prison is appropriate for many reasons. Mr. Weaver is a young man with a relative lack of a criminal history that includes one prior active jail sentence lasting only 10 days. His personal history and characteristics are tragic. He was essentially raised without parents – his mother an absent drug addict, his father completely uninvolved – in abject poverty in America's most dangerous city. Left to himself, he was lost to the streets. Though of course serious and inexcusable, the context of the offense also merits a sentence of 25 years; the killing of Mr. Finney came during a back-and-forth "war" with the Crips, a violent national street gang of which Mr. Finney was a member. A sentence of 25 years is commensurate with similar cases in this district. Such a sentence also takes into consideration the impact of Mr. Weaver's particularly harsh conditions of confinement, as well as the sentencing goals of deterrence and public safety, which scholarship suggests are failed by adding an additional 5 years to an already lengthy sentence. In sum, 25 years is "sufficient but not greater than necessary." 18 U.S.C. § 3553(a).

## PROCEDURAL HISTORY

Mr. Weaver was initially charged on March 8, 2019 with co-defendants Jamal Jackson, Jermaine Sumpter, and Kevin Brooks for participating in a "fake stash house" robbery scheme arranged by state and federal authorities. ECF No. 1 (complaint); Pre-sentence Report (PSR) p. 4. Specifically, Mr. Weaver agreed to assist a purportedly disgruntled drug courier with the robbery of a drug stash-house. PSR p. 6. The arrangement was a ruse – there was no stash house – and Mr. Weaver and his co-defendants were arrested when they showed for the phony robbery. *Id.* p. 7. Sumpter, Jackson, and Brooks each entered guilty pleas to the fake attempted robbery. Sumpter received 37 months for his role in the offense. ECF No. 100. Jackson received 60 months. ECF No. 137. Brooks has not been sentenced yet.

In the course of its investigation, the government employed a confidential informant who recorded several meetings with Mr. Weaver. In one such meeting, Mr. Weaver admitted to participating in a shooting. Unbeknownst to Mr. Weaver, the government was listening and was well aware of the incident, a July 2017 double-shooting at a West Baltimore gas station where men, including a member of the "ETG Crips," a violent, drug-dealing street gang, were shot by two assailants. One victim, Diamonta Boyd, was injured after being shot by another assailant, but survived. The second victim, Mr. Finney, was shot by Mr. Weaver and died instantly at the scene.

Though they suspected his involvement, authorities initially lacked the evidence to pursue charges against Mr. Weaver for the shooting of Mr. Finney. That changed when Mr. Weaver was recorded talking to the confidential informant. In fact, the confidential informant approached Mr. Weaver with the specific goal of eliciting incriminating statements about Mr. Finney's murder. With his recorded admission, a video of the shooting, and additional corroborating evidence, authorities decided to pursue what amounts to a homicide charge against Mr. Weaver. First,

federal authorities pursued the "fake stash house" case.  Later, in August of 2018, a superseding indictment added the charges related to the murder of Mr. Finney.  ECF No. 71.  Mr. Finney's shooting fell within federal jurisdiction because the government alleged that it related to an ongoing dispute between the "Baccwest ETG Crips" and a group of men and boys from Abington Avenue over who could sell drugs at the gas station.  *Id*.

On February 27, 2020, Mr. Weaver entered a guilty plea to count two of that superseding indictment and admitted to the drug-related killing of Mr. Finney.  PSR p. 4.  The plea was entered pursuant to an agreement with the government calling for a prison sentence between 25 and 30 years and a term of supervised release of 5 years.  Plea Agreement p. 5.  Sentencing has been postponed several times due to the COVID-19 pandemic and is now scheduled to occur by video conference on February 2, 2021.[1]

## **ARGUMENT**

The Court's overarching directive is to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing, which include: "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).  In determining the appropriate sentence, the Court is required to consider, among other factors, the nature and circumstances of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentencing disparities, and the objectives of sentencing.  *Id.* § 3553(a).  While

---

[1] Mr. Weaver has filed a waiver of his right to be physically present at sentencing and consent to proceed by video-conference.  ECF No. 154.

no punishment can undo the tragic loss of Mr. Finney, this Court must mete out a sentence that weighs that serious harm among many factors. Mr. Weaver respectfully submits that such a balancing yields a sentence of 25 years' imprisonment.

In sentencing Mr. Weaver, we ask the Court to weigh Mr. Weaver's difficult upbringing as a fatherless child with little parental guidance raised in extreme poverty and surrounded by drugs and violence on the streets of America's deadliest city. Mr. Weaver's crime is among the most serious this Court sees and the loss of Mr. Finney is inexcusable. But we ask the Court to view Mr. Weaver's conduct in the context in which it occurred: a veritable "war" between the smaller Abington Avenue group to which Mr. Weaver belonged and the larger, well-organized, and notoriously violent Crips. We also ask the Court to give careful consideration to sentencing outcomes in other cases in this district. A sentence of 25 years also takes into consideration Mr. Weaver's conditions of pre-trial confinement, first at Chesapeake Detention Facility (CDF) until he was moved for his safety to Northern Neck Regional Jail (NNRJ) after the ETG Crips were indicted in federal court and Mr. Weaver was expressly named as a victim of their offenses. Mr. Weaver has already spent almost 2 years in custody justifiably fearing for his life due to the dual threat of COVID-19 and being marked for death by the ETG Crips. A sentence of 25 years will send a message of deterrence to Mr. Weaver and others who are similarly situated, as scholarship and data reflect that an additional 5 years in prison will do nothing to protect the public or deter crime.

**A. Mr. Weaver's History And Characteristics Show A Person Impacted By A Horrific Past And With Character To Lead A Promising Future.**

**1. Mr. Weaver Had A Difficult Upbringing As He Grew Up Fatherless And In Abject Poverty In The Most Violent City In America.**

The Court must consider Mr. Weaver's history and characteristics. *See* 18 U.S.C. § 3553(a)(1). Cortez Weaver is a 29-year-old father of 2 young children who has spent nearly his entire life in Baltimore City. Those who know him best describe Mr. Weaver as a quiet, funny person who often makes them laugh. His long-time friend, Jasmine, writes in a character letter that "[h]e laughs to hide his pain," the pain of a difficult upbringing. Exhibit 3 (Character Letters). Mr. Weaver cares deeply for those he loves, calling from jail nearly every day to check on his children and to see if there is anything he can do to help them. Mr. Weaver is also described as a hard worker who held down multiple jobs operating a forklift and worked hard to earn his GED after dropping out of high school in 10th grade. His friends and family are understandably devastated that he is facing such a lengthy sentence, given the potential they (and others) see in him and how it seemed as though he was building a positive life for himself over the last few years. Friends and family, however, also acknowledge that Mr. Weaver has struggled for his entire life against issues that were largely outside of his control.

Mr. Weaver was born in August 1991 to Stephanie "Trina" Davis and Lennie Weaver at St. Agnes Hospital in Baltimore. His parents were in their early twenties when Mr. Weaver was born and had been together for many years; they had been elementary school sweethearts. Unfortunately, their relationship unraveled right around the time of Cortez's birth. Ms. Davis describes Lennie[2] as a "thief" and reports that he was serving a 5-year prison sentence when Cortez

_____
[2] To avoid confusion, throughout this section, at times individuals, including Cortez Weaver, are referred to by their first names.

was born.  Despite repeated promises, Lennie never came to meet Cortez after Lennie was released from prison.  After a few missed weekends, Ms. Davis told Lennie just to stay away as she did not want to keep disappointing young Cortez.  Lennie moved to Pennsylvania to get a fresh start, but ended up serving another prison sentence for attempted murder and related charges after breaking into a woman's house and attempting to kill her.[3]  Cortez has never met Lennie nor received any sort of support from him.  Ms. Davis reached out to Lennie after Cortez's arrest to ask Lennie to help support Cortez through this experience, but she did not receive a response.

With his father absent from his life, Mr. Weaver was dependent on his mother and her family for care.  Unfortunately, Ms. Davis and her family were unable to provide the care he needed.  Ms. Davis was one of 10 children raised by her mother, Alimeter Irby.  Ms. Irby was the sole source of stability for her children and raised them largely alone, as her children's fathers were either deceased or uninvolved in their lives.

In 1988, a violent act in the streets of Baltimore set off a course of events that impacted the life of Mr. Weaver, who wasn't even born yet.  One of Ms. Irby's sisters, Brenda Irby, was murdered just blocks from her mother's home in Baltimore.  The killing occurred only minutes after Alimeter said goodbye to Brenda, and the killing hit the family hard.  Many in the family had already been struggling, but Brenda's murder sent the family into a tailspin from which they never recovered.  Relatives report that siblings who were not already abusing drugs, like Mr. Weaver's closest aunt, Shirley Irby, started using drugs to cope with the despair.  By the time Mr. Weaver was born, his mother (Ms. Davis) and all her living siblings were regularly using drugs.  Shirley, Cortez's aunt, remembers Ms. Davis drinking and using crack cocaine throughout her pregnancy

---

[3] *See Commonwealth of Pennsylvania v. Lennie Weaver*, Court of Common Pleas Case No. 01-1097.

with Cortez. This type of prenatal exposure to substances has been associated with multiple, life-long problems including cognitive issues, executive functioning problems, memory issues, and attention-deficit disorder.[4] Possibly because of these types of issues, prenatal substance exposure has been associated with behavioral problems in school, as well as adult involvement in the criminal justice system.[5]

Apart from potential biological impacts, Cortez's early life was heavily shaped in other ways too by his maternal family's substance abuse problems. His grandmother, Alimeter, continued to be the only source of stability for another generation of family members as her children had their own children. Cortez and his mother always lived with Alimeter, who was also caring for all the other children in her extended family whose parents could not provide for them. This included Brenda Irby's son, Charles, as well as the 5 children of Ms. Davis' sister, Melissa. Even though Cortez's mother was physically around, she was almost always high and was not really mentally present. Marquis Weaver, a cousin who grew up with Cortez, reports that



*A childhood photo of Cortez (Left, in the green jacket) with his mom and his cousins.*

[4] *See* Marylou Behnke & Vincent C. Smith, American Academy of Pediatrics, Committee on Substance Abuse & Committee on Fetus and Newborn, *Prenatal Substance Abuse: Short- and Long-term Effects on the Exposed Fetus*, Pediatrics, Vol. 131, No. 3 (Mar. 2013), https://pediatrics.aappublications.org/content/pediatrics/131/3/e1009.full.pdf.

[5] *Id.*

his mother "was high all day long."  Marquita Weaver, another cousin, remembers that she and her siblings rarely saw their mother, either.  Melissa Davis (Marquis' and Marquita's mother and Cortez's aunt) would come to Alimeter's house "every six months or so, steal everything of value to sell for drug money, and then disappear again."  Marquita thinks the frequent presence of Cortez's mother may have been more difficult emotionally on him in the long run because seeing his mother high on drugs every day was a constant reminder that he did not actually have a mother to depend on.

Cortez and his family describe Alimeter Irby as the heart of the family, and recall her as a strong woman who practiced tough love but cared for anyone in need.  At the same time, the level of care needed by her family was simply too much for one person to provide.  When Cortez was just 3-years-old, a neighbor called social services to report child maltreatment after finding 7 children "running down the street, naked or with just their underwear on."[6]  Upon going into the house, the caller learned that the children were between ages 2-4 and had been left alone.  The caller reported that the house and the children were "dirty," and that she found a child "playing with a 12" knife," another "playing with a broken window," and a third "playing with a broken plate."  While the caller was speaking with social services, Mr. Weaver's grandmother returned home and explained that she had left the children in the care of Mr. Weaver's mother and her sister, both of whom had inexplicably left the home and abandoned the children.

While speaking with great love for her grandmother, Marquita recalled that Alimeter often played an enabling role for her children and grandchildren, which exposed the children to drug usage and criminal behavior.  Alimeter let anyone who needed a place to stay live with her, and Cortez remembers nearly every one of his uncles and older male cousins living with them while

---

[6] *See* Exhibit 1 (Report of Child Maltreatment, March 15, 1995).

out on bond pending trial or on probation or parole after a conviction. This early exposure to criminal behavior sadly normalized such conduct to a young Cortez and the other children in the home. For example, Cortez's uncle, David Gilyard, lived with them for most of Cortez's childhood when Mr. Gilyard was not incarcerated for drug and gun charges or probation violations, including allegations of 1st degree murder and handgun use.[7]

In addition to his difficult family situation, Cortez was also placed further at risk by his exposure to lead as a child. Lead exposure has been a problem in Baltimore for decades, with exposure and lead poisoning rates disproportionally effecting poor, African American children in rental properties in Park Heights, Middle East, and Sandtown.[8] When he was a young child, Cortez and his family lived in one of these Baltimore neighborhoods at a rental property on Reisterstown Road. He also spent time at his great-grandmother's house on North Abington Road. According to a report prepared by ETI Environmental Laboratory and received by the undersigned, there is a history of lead paint at both addresses. The paint at the Reisterstown



*An early picture of Cortez (Left) with his cousin.*

Road address was particularly problematic, as records indicate both interior and exterior paint was chipped, allowing for greater lead exposure since the lead was not properly encapsulated.[9]

---

[7] *See State of Maryland v. David Gilyard*, Baltimore City Circuit Court Case No. 195187019.

[8] *See* Jim Haner, *Studies Suggest Link Between Lead, Violence*, Baltimore Sun (May 9, 2000), https://www.baltimoresun.com/maryland/bal-te.lead09may09-story.html.

[9] *See* PSR ¶ 87; *see also* ETI Environmental Laboratory Report (available on request).

Research indicates that lead exposure in early childhood is associated with lowered cognitive functioning and downward social mobility.[10]  Two of the cousins that grew up with Cortez successfully filed lead-based law suits and earned substantial settlements due to their lead exposure at the Reisterstown Road address.

Besides merely placing him at high risk for lead exposure, living at the Reisterstown Road address exposed Cortez to a troubled neighborhood with frequent violence and drug activity. Reporting in the *Baltimore Sun* throughout the 1990s documents residents complaining about ongoing problems with prostitution and blatant drug dealing on the streets.[11]  Even places in the community that should have been a safe haven for children, like the elementary school Cortez attended, were not.  In the early 1990s, a kindergarten teacher who worked at Malcom X Elementary was shot in an attempted carjacking outside the school.[12]  In the late 1990s, when Cortez was a student at the school, Rev. Junior Lee Gamble, a 73-year-old pastor in the neighborhood was murdered for the $15 he had in his pocket.[13]  The person who killed him ran

---

[10] Reuben et al., *Association of Childhood Blood Lead Levels with Cognitive Functioning and Socioeconomic Status at Age 38 Years and with IQ Change and Socioeconomic Mobility Between Childhood and Adulthood*, Journal of American Medicine (Mar. 18, 2017), https://jamanetwork.com/journals/jama/fullarticle/2613157.

[11] *See* Michael James, *Citizens Weary of Crime Give Frazier an Earful*, Baltimore Sun (Mar. 11, 1994),  https://www.baltimoresun.com/news/bs-xpm-1994-03-11-1994070016-story.html;  Peter Hermann & Tim Craig, *Baltimore Faces New Beachheads in War on Drugs; In Park Heights, Trade Flourishes Despite Police Focus; "It Has Just Shifted,"* Baltimore Sun (June 9, 2000), https://www.baltimoresun.com/news/bs-xpm-2000-06-09-0006090259-story.html.

[12] *See* Jay Apperson, *Pain, Fear, Doubt Haunt Wounded City Teacher*, Baltimore Sun (Dec. 26, 1994), https://www.baltimoresun.com/news/bs-xpm-1994-12-26-1994360050-story.html.

[13]  Peter Hermann & Jim Haner, '*They Killed Him Over 15 Dollars'; Neighbors Mourn Park Heights Pastor; No Suspects in Slaying*,  Baltimore Sun (July 17, 1999), https://www.baltimoresun.com/news/bs-xpm-1999-07-17-9907170157-story.html.

away through Towanda Park where kids from the elementary school played.[14]  Children from the school shared the park with adult drug users, and worried about getting poked by drug needles if they fell while playing.  Residents noted that the park's edge had become "a Sherwood of thieves and dope addicts landscaped with syringes, liquor bottles and discarded stolen goods," where "[a] gang rape, a hanging and robberies numerous enough to call routine [took] place" during Cortez's formative years.[15]  Cortez saw several shootings first-hand while growing up, including the shooting of his cousin.  PSR ¶ 92.  Growing up in an impoverished and violent City and in his home, meant that Cortez was constantly in an environment where drugs were normalized and there were few adults able to look out for his needs.  Thus, Cortez turned to friends for support at a young age, and learned to value the tight bonds of neighborhood friendship that are often born out of urban struggle.  Sadly, this would lay the groundwork for the loyalty that would later contribute to the instant offense.

---

[14] Tim Craig, *City Tries to Salvage Community and Park; Improvements Scheduled for Site Overtaken by Drugs and Violence*, Baltimore Sun, p. 3B (July 28, 1999).

[15] *See supra* n. 13.

Though Cortez does hold some positive memories from his childhood, he undoubtedly needed more support from the adults in his life than he received. As one example, Cortez's first-grade teacher described him as "cooperative and friendly" and "a pleasant child," but also indicated that he "misses a number of skills because of his attendance."[16] At that young age, when school attendance is largely dependent on adult involvement, Cortez missed an astonishing 56 days of school and was late for 4 more.[17] As another example, while he eventually received a diagnosis (and some modest intervention) for ADHD after repeating the third grade, Cortez quickly stopped taking medication for the condition and still copes with it on his own. PSR ¶ 89. Disciplinary issues mounted, including one in fourth grade that resulted in a brief expulsion from school, and he was beat at the hand of his mother. *Id.* ¶ 100. During his Pre-Sentence Report interview, Cortez remarked that the "only time" his mother was a "mother" was when she beat him for getting into trouble. *Id.* Without appropriate parental guidance, Cortez struggled.



*An early picture of Cortez during the holidays.*

There were also signs at home that Cortez needed more adult support. Although his grandmother, Alimeter, loved all her grandchildren, family members report that Cortez was not her favorite and there was not a lot of attention to go around. Alimeter's attention was further stretched by family members with acute health needs, including Cortez's great-grandmother, who

---

[16] Exhibit 2 (Baltimore City Schools Report Card) 1-2.

[17] *Id.*

lived with them for several years before she passed away and needed frequent medical care. Around the same time, when Cortez was about 10-years-old, Alimeter also had to care for her grandson and Cortez's cousin, Charles, who had a bad accident and was bed-ridden and depressed for several years. Though Charles eventually regained his mobility, he continued to hear voices in his head and was never able to independently care for himself after the accident.

Perhaps not surprisingly, this lack of attention often manifested itself in emotional outbursts, and they were strong for Cortez. Family members remember him having intense reactions to stressors in his life. Cortez's cousins, Marquita and Marquis, both remember being beaten by their grandmother, Alimeter, as a punishment for wrongdoing. Marquita recalls that most of the children would take beatings in stride, but Cortez would threaten suicide by wrapping a belt around his neck or saying he was going to jump off the roof. Similarly, Cortez had a strong reaction when his mother was incarcerated. In 2004, Ms. Davis was incarcerated for about 2 months on heroin distribution charges.[18] While she was locked up, Cortez attempted to kill himself by smashing a glass 40-bottle over his head. Such attempts were a frequent occurrence and continue to this day. *See id.* ¶¶ 90-93 (noting history of suicide attempts including while detained).

However, these calls for help – deeply troubling signs of distress, pleas for attention, trouble in school – apparently never resulted in the appropriate counseling, therapy, or treatment to help Cortez process the trauma of his life and learn how to respond. *Id.* ¶ 93. His cousin, Marquita, does not remember any of the adults in Cortez's life intervening at all, or offering much of any response to his self-harm beyond her own attempts to "talk[] him down." *Id.*

Life unraveled further for Cortez when he became a teenager. His cousin, Marquis, remembers that by the time they were high-school age, their grandmother, Alimeter, was older and

---

[18] *See State of Maryland v. Stephanie Davis*, Baltimore City Circuit Court Case No. 104177009.

had "too much on her plate" to pay close attention to the 7 teenagers in her care. After her 2004 arrest, Cortez's mother, Ms. Davis, went to rehab and was able to maintain her sobriety for several months. Cortez was thrilled when she came home and he finally had a mother who was present and involved. Unfortunately, the sobriety was short-lived as Ms. Davis started using drugs again after about 6 months. This was devastating to Cortez, especially because there were no huge stressors that seemed to trigger her relapse. It was as if his mother was *choosing* drug use over him. Distraught and alone, he briefly moved to North Carolina with a cousin to try to get a fresh start. However, having been born and raised in bustling Baltimore, Cortez had a hard time living in a rural area without his extended family and with no access to transportation so he moved back to Baltimore. *Id.* ¶ 78. His troubles continued.

Because he was still a minor, Cortez needed Ms. Davis to re-enroll him in school. Despite his urging, she did not do so. Sadly, this meant that he could not attend school and effectively dropped out in 10th grade. *Id.* ¶ 99. With nothing to do during the day, he ended up hanging out in the streets near his home and reports "smoking a lot of marijuana." *Id.* ¶ 94 (noting marijuana use beginning at age 14).

When Cortez turned 17, his life took a turn for the better. In a random encounter at a park, he met Sharonda Mobuary. They started dating, and Sharonda's mother, Teresa, allowed him to move in with their family. For the first time, Cortez felt like he was part of a real, functioning family where people cared about each other. Teresa remembers Cortez as a "goofy person who was always doing things to try to make them laugh." With help from Teresa's boyfriend, Cortez landed a good job at Coca-Cola. Teresa



*A prom picture of Cortez and Sharonda.*

reports that he was a hard worker and his supervisor loved him. After seeing first-hand that additional education would help his advancement at work, Cortez signed up to complete the GED program at the Westside Baltimore Youth Opportunity Center (better known as the "Yo! Center"). Phyllis Johnson, his advocate at Baltimore YO!, remembers Cortez well as "a smiley guy who got along well with the other people in the program."

Cortez's life was not without challenges while he was living with the Mobuarys, and seemingly small bad decisions compounded to become significant setbacks. After injuring himself at Coca-Cola, Cortez opted against pursuing any claim for worker's compensation. Instead, he simply self-medicated with marijuana and continued to show up for work. After testing positive for marijuana, he lost his job. *Id.* ¶ 107. He was occasionally arrested for minor offenses, and though they were frequently dismissed, they caused disruption to his life and relationship. He continued to struggle with his mother, who simply could not stop using drugs.

Still, with the support of the Mobuary family, he was able to recover from these obstacles to again find regular work as a forklift operator through First Team Staffing. He successfully earned his GED and enrolled in college coursework at Brightwood College for HVAC, electrical, and plumbing. *Id.* ¶ 101. These accomplishments were particularly impressive given that only one of his over 20 cousins graduated from high school, and Mr. Weaver can only name a handful of family members who, like him, have held steady employment.



*Cortez receiving his GED.*

But 2017 – the year of the murder of Mr. Finney – saw a series of setbacks from which Cortez would never recover. First, on April 17, 2017, his beloved grandmother passed away at the age of 78.[19] Alimeter Irby's death destroyed what remained of the family. Though Cortez's life with her had not always been easy, his grandmother had been the sole source of stability for him during the majority of his life, particularly as a child, and her loss was difficult to recover from. Around the same time, as is often the case with teenage relationships, Cortez's relationship with Sharonda began to strain. After repeated breakups and reconciliations, the two separated for good in late 2017. The finality of the break up with Sharonda was particularly difficult for Cortez. He lost not only his relationship with her but also the support he received from her whole family, including Teresa, who he thought of as his "second mom." Teresa calls Mr. Weaver the "son that [she] never had." Exhibit. 3 (character letters).

On a more practical level, the break-up with Sharonda saw Cortez lose the logistical and transportation support the Mobuary family provided. He had no car and was no longer able to attend the courses he enrolled in at Brightwood College or make it to the job placements First Team Staffing arranged for him. Cortez struggled to get back on his feet after the losses he experienced in 2017. He returned to the streets and sold drugs. What tragically followed is at the heart of this case and is recounted below.

## 2. Mr. Weaver Is A Loving Father Of Two Young Children And Has A Promising Future Ahead Of Him.

It is notable that, despite his lifetime of struggles and abandonment, Mr. Weaver has a very short criminal record. The PSR accurately reflects that he falls into Category II, and has spent virtually no time in custody prior to the instant offense. PSR pp. 10-11. His most serious charge

---

[19] *See* Alimeter Irby Obituary, Legacy.com, https://www.legacy.com/obituaries/name/alimeter-irby-obituary?pid=185167703 (last visited Jan. 13, 2021).

is a 2009 drug conviction for which he received a Probation Before Judgment and no jail time. *Id.* p. 11 & ¶ 62. His second conviction, from 2013, was for a driving offense that resulted in a totally suspended sentence. *Id.* ¶ 63. His third conviction, a 2014 drug possession case, involved the possession of marijuana and garnered no jail time. *Id.* ¶ 64. A traffic offense in 2015 netted a 10-day active jail sentence. *Id.* p. 12 & ¶ 65. This driving crime is his only jail sentence. Far from a hardened criminal, Mr. Weaver's record is remarkable for its brevity, particularly given that he grew up disadvantaged in America's arguably most impoverished and most dangerous city.

Mr. Weaver's promise for the future are his two young children, a son, who was born in September 2018, and a daughter, who was born in May 2019 (after Mr. Weaver was already in jail). By all accounts, even when he was struggling on the streets and while he has been incarcerated, Mr. Weaver is and has been a loving and devoted father. He attended sonogram appointments with his son's mother while she was pregnant, and watched her young daughters so she could more easily attend her other prenatal appointments. Although Mr. Weaver was not in a romantic relationship with his son's mother by the time his son was born, Mr. Weaver was actively involved in his son's life until his arrest. He saw his son regularly, cared for him every weekend, and always found a way to get whatever his mother asked for to ensure his son was cared for.

That he will now be a physically absent father to his children weighs heavily on Mr. Weaver. He has had many emotionally wrought conversations with the mother of his children, often begging them to simply move on so that his children might find a new father. Looking back on his past, the impact of his father's absence, and the lack of parental support and guidance he received as a child, it's easy to see why Mr. Weaver would tell the mothers of his children to move on: he felt heavily the absence of his parents and doesn't want his children to suffer as he did.

Regardless, his children are an incredibly important part of his life and his chief motivation to do well in the future.

It is difficult to put into words that Mr. Weaver is, despite his worst acts, a young man with



*A picture of Cortez commemorating when he received his GED.*

much to offer society, his community, and his family and friends. Given the nature of the offense and the severity of possible punishment, his defense team met frequently with Mr. Weaver in person and, most recently, on the phone and video. Having the benefit of spending time with Mr. Weaver over almost 2 whole years, we have come to know him well as a kind and caring person in an environment where he can safely drop the "street tough" façade. Mr. Weaver has an incredible sense of humor that betrays a high intelligence he's often had to hide on the streets and, sadly, was obviously ignored while he was in school. He is a person who loves his family and is heartbroken his children will grow up without their father physically present. He has keen insight on the social ills of his community and can engage in conversation on a wide variety of topics. He can make friends with those of completely different backgrounds. While at CDF and before the pandemic, he participated in bible study and the Thinking for a Change program.

Had Mr. Weaver been born into different circumstances or provided with even minimal assistance as a young man, there is no doubt the course of his life would have been altered and this offense would not have occurred. Mr. Weaver has accepted responsibility and is prepared to move onto the next stage of his life, hopefully away from Baltimore where he can start anew. As Teresa Mobuary accurately notes, despite the hell in which he was raised and the pain he has

unquestionably caused, "Cortez has a beautiful spirit." Exhibit 3. Similarly, his friend Jasmine writes about how Cortez "has always been generous, loving, and dependable." *Id*

**B. The Tragic Murder Of Mr. Finney Came In The Midst Of A War.**

This Court must consider the "nature and circumstances" of Mr. Weaver's offense. 18 U.S.C. § 3553(a)(1). Murder is rightfully recognized as the most serious of offenses, and it calls for significant punishment. In fashioning just punishment for the crime, this Court must view the events of July 17, 2017 in their proper context. This, of course, does not excuse Mr. Weaver's conduct nor does it impact its legality, but it is a relevant consideration for purposes of imposing a sentence on Mr. Weaver that is sufficient but not greater than necessary. The killing of Mr. Finney did not occur in a vacuum. It was not a random act of violence. It happened as part of an ongoing war between armed rivals. The death of Mr. Finney was one of many tragic outcomes in broken neighborhoods in a broken city where young men too often live by a chilling code: kill or be killed.

Indeed, the government's investigation into activities in these neighborhoods has resulted in many charges against many individuals in this Court, including for murder, retaliation, drugs, and guns. Much of what follows to explain the context of Mr. Weaver's offense comes from government filings in two cases in this Court. The first is a large RICO indictment charging many members of the "ETG Crips," including an individual named Trayvon Hall and a member of Mr. Finney's own family, his uncle, Ronnie Finney. *See United States v. Trayvon Hall, Ronnie Finney, Donnell Foster, Daran Hickman, David Jackson, Alvin Johnson, Keith Pinson, Devon Powell, Ridgley Shipley, Marcus Williams*, No. CCB-19-568 ("RICO Case"). The second case was prosecuted before your Honor and charged the unlawful possession of a handgun by Mr. Hall. *See United States v. Trayvon Hall*, No. RDB-19-355 ("Hall Case"). Mr. Hall received a sentence

of 30 months in the handgun case. The RICO case is pending before Judge Blake.

The events of July 17, 2017 and the shooting of Mr. Finney stemmed from an ongoing violent dispute between street gangs over the sale of drugs at a Sunoco gas station near the intersection of Baltimore and Hilton Streets. Mr. Weaver pled guilty to being a member of a conspiracy to distribute narcotics in and around the gas station—namely, what the government deemed the "Abington Avenue drug trafficking organization" after the street on which its members congregated and sold drugs. ECF No. 117. This loosely organized group of men and boys often sold drugs, including in 2017, at the Sunoco gas station at the intersection of Baltimore and Hilton Streets.

Another group, however, decided that it wanted to lay claim to the Sunoco as its "turf" to sell drugs: the tightly organized and notoriously violent street gang known as the Baccwest ETG Crips. This violent gang was allegedly led by Trayvon Hall and is described by the government as a "violent subset of the Crips gang that operated on the streets and in correctional facilities in Maryland and elsewhere." RICO Case, Superseding Indictment p. 2, ECF No. 20. The group was founded with the express permission of the West Coast leaders of the larger ETG Crips after Mr. Hall personally sought a "blue light" for a Baltimore chapter. *Id*. pp. 2-3. "For many years, the ETG Crips controlled the drug trade in particular territories in Baltimore City, including the area around the intersection between West Baltimore Street and North Hilton Street . . . ." *Id.* p. 2. "The ETG Crips' primary drug shops were located in the Baltimore Hilton neighborhood (which the Baccwest ETG Crips considered to be their headquarters) [and two other neighborhoods]." *Id*. p. 4. "[ETG] Crips members enhanced their status within the gang by carrying out acts of violence against rivals and witnesses." *Id.* p. 3. "Non-members who attempted to sell drugs in the ETG Crips' territories were targeted for violence by ETG Crips members." *Id.* p. 4.

In July 2017, the Baccwest ETG Crips and Mr. Weaver's Abington Avenue group began feuding over who could sell drugs at the Sunoco. *Id.* p. 23. The Abington Avenue group – the loosely affiliated amalgam of men and boys from the neighborhood, some of whom may have been associated with other gangs – had claimed the Sunoco for some time. *See id.* pp. 23-24. The ETG Crips, however, had other plans and made it known that it was intending to use the Sunoco as a base of operations. According to the government, Trayvon Hall "directed the ETG Crips to use violence to retaliate against anyone who refused to respect the boundaries of their newly claimed turf." *Id.* p. 24.

On July 14, 2017, the dispute boiled over when Christopher Hockaday and Dwayne "Rico" Torrence, both associated with the Abington group, attempted to make a drug sale at the Sunoco. *Id.* p. 24. Mr. Finney, whom the government identifies as an "ETG Crips member," "told [Mr. Hockaday and Mr. Torrence] that they could not sell their product [at the Sunoco]." *Id.* Mr. Hockaday and Mr. Torrence refused to back down, and word of the standoff soon got back to the leadership of the ETG Crips. *Id.* Soon thereafter, the leadership of the ETG Crips responded by authorizing the killing of members of the Abington Avenue group who "refused to respect the boundaries of the ETG Crips' drug turf," which now included the Sunoco. *Id.*[20] By nightfall, Mr. Hockaday would be dead at the hands of the ETG Crips in a shooting directly authorized by

---

[20] This was apparently not the first time Mr. Hall had called for the general eradication of his enemies. The RICO Case indictment reveals that he had previously required prospective ETG Crips members to murder a member of a rival gang as a "prerequisite to membership in the ETG Crips." RICO Case, Superseding Indictment p. 14. Mr. Hall even asked for pictures of rival gang members so that ETG Crips could compile a list of targets. *Id.* pp. 14-15. Mr. Hall received images of several alleged rival gang members, later allegedly personally killing two himself: Albert Pitman and Shyheim Brown. *Id.* pp. 17-18.

Mr. Hall.  *Id.*  Mr. Hockaday was 31-years-old and numbered homicide 189 of 343 Baltimore City murders in 2017.[21]

Violence begets violence and a war had broken out between the ETG Crips and what remained of the Abington Avenue group.  On July 17, 2017 at 7:09 p.m., the Abington group responded in kind.  It was that evening when a 25-year-old Mr. Weaver headed to the gas station with Mr. Torrence to avenge Mr. Hockaday's murder and strike back at the ETG Crips.  There they found Mr. Finney, the ETG Crips' member who had feuded with Mr. Hockaday just a few days before.  *Id.* p. 24; *see also* Plea Agreement p. 10.  Mr. Finney was shot in the head by Mr. Weaver and died instantly.  He was 22-years-old.  Mr. Torrence shot Diamonta Boyd, who survived.  Another person at the gas station fled as Mr. Weaver fired at him, too.  That person was apparently unharmed and his identity was not provided to the defense.  Mr. Weaver and Mr. Torrence fled and the war continued.

After Mr. Finney was killed, Mr. Hall "instructed the ETG Crips to retaliate by killing any and all members" of the Abington Avenue group, even those who weren't involved in the shooting of Mr. Finney.  RICO Case, Superseding Indictment, p. 24.  For the next 2 years, the government alleges that the ETG Crips conspired to murder Mr. Weaver, Mr. Torrence, and others affiliated with Abington Avenue.  *Id.* ("From in or about July 2017 through in or about July 2019, Trayvon Hall [and other members of the ETG Crips] conspired to murder" Mr. Weaver and other members of the Abington Avenue group); *see also* pp. 24-25, 31, 36.  And the ETG Crips tried hard to accomplish this goal.

---

[21] *See* Colin Campbell, *Woman, 34, Grazed in West Baltimore Shooting; Homicide Victim Identified*, Baltimore Sun (July 19, 2017), https://www.baltimoresun.com/news/crime/bs-md-ci-overnight-shooting-20170719-story.html; Kevin Rector, *Baltimore Has Now Had 343 Homicides in 2017, Sets Record for Killings Per Capita*, Baltimore Sun (Dec. 27, 2017), https://www.baltimoresun.com/news/crime/bs-md-ci-per-capita-homicides-20171227-story.html.

In fact, "[o]n January 15, 2019, Trayvon Hall asked members of the ETG Crips if anyone had a photograph of [Mr. Weaver]," and another member of the ETG Crips responded by sending a blurry image of Mr. Weaver. *Id.* p. 31. The intent was clear: Mr. Weaver was marked for death by the ETG Crips. In March 2019, Mr. Hall lamented that Mr. Weaver had been arrested "before the ETG Crips could get to him." *Id.* p. 36. Another ETG Crips member noted that things would "get ugly" because of Mr. Finney's death and that Mr. Weaver and others were "gonna see what comes behind that." *Id.* p. 24. In August 2017, Mr. Hall sent a message to a fellow ETG Crips member who was incarcerated with Mr. Torrence (who was prosecuted and convicted in state court) demanding that Mr. Torrence be assaulted or killed. *Id.* p. 25. The targeting of Mr. Weaver and others associated with the Abington group was so pronounced that the government went so far as to officially label Mr. Weaver a victim of Count One of the indictment alleging the ETG Crips' racketeering conspiracy. *E.g.*, *id.* p. 24 (labeling Mr. Weaver as Victim 13).[22]

Mr. Hall personally vowed to end Mr. Weaver's life. This was more than an idle threat as Mr. Hall had a track record of ending the lives of those who opposed his gang. *See supra* n. 20. In a sentencing submission to Your Honor in Mr. Hall's handgun case, prosecutors included an image taken from a social media post showing Mr. Hall firing a gun at an indoor range. Hall Case, Government's Sentencing Memorandum p.5, ECF No. 28; Hall Case, Exhibit 1 to Government's Sentencing Memorandum p.5, ECF No. 28-1. Mr. Hall wears a shirt that says "On Mitch" in a font made to look like it is dripping red blood. *Id.* Mr. Hall posted this image to social media with a warning: "#OnMitch I never miss the target" – another explicit reference to avenging the death of Mr. Finney. *Id.* Mr. Hall also posted a short video to social media where he looks toward

---

[22] This designation is not without significance as Mr. Weaver is entitled to the rights afforded to "crime victims" under 18 U.S.C. § 3771.

Abington Avenue while declaring "I got you little cuz [referring to Mitch Finney], you heard me? I'm gonna tear this bitch up for you, every chance I get." Rico Case, Superseding Indictment p. 25. Mr. Weaver was, and remains, marked for death.

To be sure, Mr. Weaver's conduct is not excused by the actions of the ETG Crips, and Mr. Weaver has never raised this claim in a formal or informal way. Nor is Mr. Weaver's conduct excused because it occurred amidst a war of armed rivals. Mr. Finney's death, like any murder, is tragic and inexcusable. We understand and deeply regret the pain and sorrow his family and friends endure after the loss of their loved one. Mr. Weaver has accepted responsibility for his actions, and he must and will accept the consequences of his actions. But in considering what sentence under § 3553(a) is sufficient but not greater than necessary to achieve the goals of sentencing, the context in which the offense occurred matters. This was not a random act of violence committed in cold-blood by a dangerous person who needs to be incapacitated from society for the rest of his life. Sadly, this was a shooting that was the product of a larger cycle of violence. The Court should not ignore that Mr. Finney was a member of the ETG Crips and actively engaged in a violent war against Mr. Weaver and his friends. The roles could have easily been reversed, and had the chance presented itself, it would be Mr. Weaver dead on the pavement at the hands of the Crips. Indeed, this is the very lesson learned from the government's investigation: Mr. Finney and his friends are the victim in this case and Mr. Weaver the defendant; in the pending RICO Case before Judge Blake, Mr. Weaver and his friends are the victims and Mr. Finney's family member and friends the defendants.

This cycle of violence must be stopped. There is ample evidence that prison alone will not accomplish that goal. *See infra*. That evidence includes the grim number of homicides in Baltimore that continue to skyrocket despite years of targeted efforts by the federal and state

governments to ensure lengthy sentences in prison for violent conduct. Regardless, whatever benefit incarceration lends to the effort to bring peace to Baltimore is unquestionably achieved in this case with a sentence of 25 years, which adequately reflects the very serious nature of Mr. Weaver's conduct.

### C. Mr. Weaver's Involvement In The Fake Stash-House Robbery Is Accounted For In A 25 Year Sentence.

The undersigned recognize that Mr. Weaver is not before the Court solely for his conduct on July 17, 2017. He is also before the Court for his participation in a fake stash-house robbery. That fake opportunity was created as a means to detain Mr. Weaver after he gave incriminating statements about Mr. Finney's death, and it should be viewed as such in determining the appropriate sentence.

The Court should not give undo weight to the fake stash-house robbery in determining the severity of Mr. Weaver's punishment. That Mr. Weaver, who had turned to drug dealing as a way to make money, was willing to participate in a fake stash-house robbery when approached by the confidential informant is not surprising. *See, e.g.*, *United States v. Conley*, 875 F.3d 391, 402-03 (7th Cir. 2017) ("Beginning many years ago, we criticized these [fake stash-house] cases as 'tawdry,' noting in particular how these operations are 'directed at unsophisticated, and perhaps desperate defendants' . . . who easily take the all-too-tempting bait put out for them by the government."). Nor is it surprising that, during the course of planning the fake robbery, Mr. Weaver puffed himself up about the steps he was supposedly prepared to take to show what-he-thought-was a disgruntled drug courier that he (Mr. Weaver) was up to the job of stealing multiple kilograms of heroin from a house guarded by multiple armed individuals. Indeed, these cases have been criticized because the government "can initiate and facilitate criminal conduct," *United States v. Washington*, 869 F.3d 193, 227 (3d Cir. 2017) (McKee, J., concurring in part and

dissenting in part), manipulate "the obstacles that a defendant must overcome to obtain the drugs," *United States v. Briggs*, 623 F.3d 724, 730 (9th Cir. 2010) and inflate sentences with "unfettered" discretion, *Briggs*, 623 F.3d at 729-30; *see also Washington*, 869 F.3d at 226 (McKee, J., concurring in part and dissenting in part) ("It is very troubling that the government can initiate and facilitate criminal conduct, and make strategic choices that result in sentences that have a relationship to culpability that is, at best, tenuous and theoretical."). Indeed, this Court has seen dozens of defendants who agreed to the same or similar schemes. We do not raise a challenge to the fake stash house scheme here because the government has always made clear that its primary goal was to hold Mr. Weaver accountable for Mr. Finney's death in federal court, and it has successfully done so. There is little utility in looking at this separate event as much more than an effort to ensnare Mr. Weaver in a scheme to detain him while the government continued their investigation into Mr. Finney's death.

At bottom, Mr. Weaver's willingness to engage in a fake stash-house robbery and the statements he made to an undercover officer and a confidential informant while planning the robbery do not provide any additional reasons under 18 U.S.C. § 3553(a) to sentence him to more than 25 years' imprisonment.

### D. A 25 Year Sentence Is Commensurate With Other Sentences In This District For Similar, Or More Egregious, Conduct.

This Court must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6). The plea agreement in this case envisions a sentence of between 25 and 30 years (300 and 360 months).[23]

---

[23] The PSR recommends a final adjusted offense level of 40. PSR ¶ 59. Coupled with a criminal history category II, *id.* ¶ 67, Mr. Weaver's recommended sentence falls between 324 and 405 months. *Id.* ¶ 113. That range is capped at 360 months (30 years) by the terms of the Rule

Mr. Weaver's requested sentence falls at the exact median of murder sentences in Maryland's federal court. In 2019, the District of Maryland sentenced 43 defendants in cases involving murder. *See* U.S Sentencing Commission, *Statistical Information Packet, Fiscal Year 2019, District of Maryland*, 3.[24] 33 of these sentences followed a guilty plea, and 10 followed a trial. *Id.* at 7. The mean sentence for murder in Maryland's federal court was 310 months, and the median was 300 months. *Id.* at 11. Thus, the requested sentence of 300 months falls in the middle of sentences imposed for this same offense, an appropriate outcome for a defendant like Mr. Weaver with a minimal criminal record. It bears noting that Maryland federal homicide sentences fall above the national mean (255 months) and median (240 months) for murder. *Id.*

This data reflects the reality that many Maryland homicide cases, some involving multiple victims, result in sentences at or below Mr. Weaver's request of 25 years. Of particular note is *United States v Garrion McCellan*, No. CCB-16-235. Mr. McCellan was convicted of conspiracy to possess with intent to distribute and to distribute controlled substances and possession of a firearm in furtherance of a drug trafficking crime causing death. He admitted to committing 2 separate drug-related murders and badly injuring a third person in a drug-related shooting. One murder was meticulously planned. Yet, Mr. McCellan still received a sentence of 25 years.

Others notable cases in which the defendant received a sentence at or below 25 years include:

- *United States v. Manuel Martinez-Aguilar*, No. JKB-17-589 (defendant sentenced to 24 years for racketeering conspiracy and 924(c) in connection with MS-13 activities, including conspiring to and attempting to murder 2 people);

---

11(c)(1)(C) plea agreement. The plea agreement resulted in a guidelines range outlined by a level 41, not 40. Plea Agreement ¶ 7.

[24] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/md19.pdf.

- *United States v. Deandre Smith*, No. CCB-16-235 (defendant sentenced to 25 years despite running a massive drug shop and ordering 2 murders);

- *United States v. Silvia Martinez*, No. RWT-11-0004 (defendant sentenced to 24.4 years for participating in a kidnapping and murder of a 15-year-old and driving around in a car with 2 other gang members who shot two other men, killing one of them);

- *United States v. Molina-Valladarez et al.*, No. RWT- 09-471 (defendants sentenced to 24.4 and 23 years for either personally killing a victim in gang-related murder or aiding/abetting the same);

- *United States v. Ysaud Flores*, No. RWT-09-471 (defendant sentenced to 22 years for participation in a kidnapping and murder of a 15-year-old thought to be a rival gang member);

- *United States v. Asim Benns*, No. GLR-13-677 (defendant sentenced to 23 years where he planned and/or participated in the murders of 2 rival gang members and 2 other shootings, ran a heroin shop, distributed drugs, and robbed 2 banks);

- *United States v. Steven Jackson*, No. GLR-13-677 (defendant sentenced to 25 years despite admitting to murdering a rival gang member and shooting another person);

- *United States v. Gregory Sykes-Bey*, No. GLR-13-677 (defendant sentenced to 24 years despite admitting to 2 shootings and murder of a rival gang member);

- *United States v. Michael Smith*, No. GLR-13-677 (defendant sentenced to 24 years; despite admitting to murdering a rival gang member and possessing a firearm used in that murder and 2 additional shootings);

- *United States v. Elijah Sykes-Bey*, No. GLR-13-677 (defendant sentenced to 24 years despite admitting to participating in murders of 2 rival gang members);

- *United States v. Donte Thornton*, No. GLR-13-677 (defendant sentenced to 15 years for participating in a shooting and murder of a rival gang member);

- *United States v. Brandon Bazemore*, No. CCB-16-597 (defendant sentenced to 25 years despite committing 3 murders and an attempted murder and admitting to routinely selling packs of heroin);

- *United States v. Terrell Plummer*, No. GLR-17-223 (defendant sentenced to 25 years despite admitting to killing a 3-year-old);

- *United States v. Leonard Chase*, No. GLR-16-453 (defendant sentenced to 25 years despite participating in the shooting and killing of a man);

- *United States v. Christopher Dukes*, No. GLR-16-453 (defendant sentenced to 23 years despite attempting to strike a law enforcement officer with his car, participating in the shooting and killing of one person and shooting of another individual, and participating in killing of yet another individual);

- *United States v. Terrell Luster*, No. GLR-16-453 (defendant sentenced to 23 years for killing one person and being present during the shooting of 2 others);

- *United States v. Caesar Rice*, No. GLR-16-453 (defendant sentenced to 22 years for shooting one person and being present during murder of another person).

### E. Mr. Weaver Has Endured Harsh Conditions Of Pre-trial Confinement, Including Contracting COVID-19.

Largely due to the COVID-19 pandemic, Mr. Weaver has now been detained for a period of almost 2 years, first at CDF and then, for the past several months, at NNRJ. He has endured the usual harsh conditions of pre-trial confinement at CDF that this Court hears about on a regular basis. These conditions have been compounded for almost a full year as the COVID-19 pandemic has taken hold. Perhaps not surprisingly, Mr. Weaver contracted COVID-19 and has experienced resulting health concerns. To make matters worse, for a period of his confinement, Mr. Weaver was a "sitting duck" at CDF, where his life was at risk of a gang "hit" being carried out until he ultimately had to be moved to NNRJ, far away from those he knows.

Mr. Weaver was detained at CDF from March 2019 to October 2020. The Court is familiar with the harsh conditions detainees experience at CDF, including cramped and restrictive living quarters shared with rodents and existing on a substandard diet with limited programming. Mr. Weaver's confinement was uniquely difficult since he deals with severe pain from migraine headaches. PSR ¶¶ 83-85. The pain of his conditions is often incapacitating, throbbing, and accompanied by nausea. *Id.* Neurologist Dr. Thomas Hyde concluded that Mr. Weaver's "headache is unilateral in distribution, with pain pulsating (throbbing) quality, moderate/severe intensity, and is accompanied by nausea and light and noise sensitivity." *Id.* CDF is both loud

and light-filled at nearly all hours of the day, impacting Mr. Weaver more severely than others.

The COVID-19 pandemic has made conditions of pre-trial confinement even more trying. When the COVID-19 pandemic hit in March 2020, Mr. Weaver lost all visitation with friends and family, as well as in-person legal visits from his defense team. His recreation time and out-of-cell privileges were similarly curtailed. While these conditions were admittedly shared by many at CDF, the impact of the pandemic has been particularly hard on those, like Mr. Weaver, who struggle with their mental health.[25] *Id.* ¶¶ 90, 93-94.

Significantly, Mr. Weaver has spent his entire pre-trial confinement at risk of assault or death. As noted above, Mr. Weaver specifically has been targeted by the ETG Crips for death since mid-July 2017. For several months, he was housed at CDF with Trayvon Hall, though the two were on separate tiers. This arrangement was manageable since Mr. Weaver and Mr. Hall would infrequently cross paths. This, however, was not without risk. While well-intentioned, separation orders are not fail-proof. They do not protect against potential interaction during movement around the facility for activities such as medical and legal visits and programming. Nor would a separation order have protected Mr. Weaver against any effort to recruit others who did have regular access to him (*e.g.*, shared communal space or a cell) from carrying out the "hit" on him for money or to curry favor for some reason or another with the Crips. When the government

---

[25] CDC, "Coping with Stress" (updated Dec. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/managing-stress-anxiety.html ("Public health actions, such as social distancing, can make people feel isolated and lonely and can increase stress and anxiety."); Chara Malapani, MD, PhD, Columbia University Department of Psychiatry, "COVID-19 and the Need for Action on Mental Health" (May 25, 2020), https://www.columbiapsychiatry.org/news/covid-19-and-need-action-mental-health (noting that the UN Secretary-General António Guterres "highlighted how those most at risk today" included "those with pre-existing mental health conditions"); United Nations, *Policy Brief: COVID-19 and the Need for Action on Mental Health* 6 (May 13, 2020), un_policy_brief-covid_and_mental_health_final.pdf ("[T]hose who previously had a mental health condition, may experience a worsening of their condition and reduced functioning.").

indicted the RICO case against the Baccwest ETG Crips, an additional approximately 9 alleged members of the gang were brought to CDF and in possible close contact with Mr. Weaver. These gang members had marked Mr. Weaver for death and were now housed within feet of him. After near-frantic calls and emails to the U.S. Marshals Service and CDF's Chief of Security, Mr. Weaver was transferred to NNRJ in Warsaw, VA. Mr. Weaver was fortunately moved before the undersigned learned of a specific, organized threat to harm him, but it bears noting that Mr. Weaver was, and will remain, at risk from both known and unknown individuals.

Mr. Weaver's time at NNRJ has been abysmal. He is three hours from home and housed with offenders from Virginia whom he does not know. The facility is notoriously miserly. NNRJ charges detainees for even the smallest of conveniences, sometimes including Advil and other over-the-counter medications. Corners are particularly tight in meal-planning, as the food at NNRJ is well-known to be substandard. Further, the commissary's prices are inflated from the prices at CDF. A replacement undershirt costs $20 and calls are expensive. Programming is minimal during the best of times, and non-existent now.

Adding to this, whatever COVID-19 precautions NNRJ had in place, they failed. Several weeks ago, Mr. Weaver contracted the deadly coronavirus and manifested many of its symptoms including difficulty breathing from heavy congestion, loss of smell and taste, sore throat, and runny nose. COVID-19 exacerbated his painful migraine condition. In accordance with NNRJ's apparent treatment plan, he was placed in a solitary confinement setting for several weeks as he essentially battled the illness alone. He continues to suffer the effects of contracting COVID-19 – namely, difficulty breathing and loss of smell.

We ask the Court to take into account the extreme difficulties of the past 2 years in imposing a sentence of 25 years' imprisonment.

### F. An Additional 5 Years Is "More Than Necessary" To Meet The Deterrence And Public Safety Goals Of Sentencing.

A sentence of 25 years' imprisonment affords adequate deterrence, both general and specific. It also protects the public from future offenses and provides just punishment. Stated differently, the government can point to no evidence that an additional 5 years in prison will meaningfully ensure the goals of sentencing are met, thus proving that anything longer than 25 years is "more than necessary." 18 U.S.C. § 3553(a).

Mr. Weaver is currently 29-years-old. If sentenced to the requested 25 years, assuming he receives the full benefit of good time credit, he will be released around the age of 50. The most recent federal data on violent offenders and recidivism reflects that detainees released over the age of 50 have the lowest reincarceration rate compared to all other violent offenders. *See* U.S. Sentencing Commission, *Recidivism Among Violent Offenders* figure 4.9, p. 38 (Jan. 2019).[26] More importantly, the data does not differentiate between those violent offenders released around the age of 55 (the approximate age Mr. Weaver would be if sentenced to 30 years as the government requests) or those released around 50.[27]

As to deterrence, there is no evidence that additional jail time provides a meaningful deterrent effect. "Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than

---

[26] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf.

[27] A more generic analysis of recidivism for all federal offenders that does not take into account specific offenses noted a slight reduction in recidivism rates for offenders released between 55-59, as opposed to those released between 50-55. But this difference is very small. *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* 29 (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf#page=9.

increasing the severity of punishment." *See* Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment* 4 (Nov. 2010).[28]  Daniel Nagin, a leading deterrence scholar, concludes that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension."   Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, Crime & Justice, Vol. 42, No. 2013.  This finding is echoed elsewhere.   *See also* National Research Council, National Academies Press, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 90 (2014)[29] ("Three National Research Council studies have examined the literature on deterrence and concluded that insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects. Nearly every leading survey of the deterrence literature in the past three decades has reached the same conclusion." (citations omitted)); Ray Paternoster, *How Much Do We Really Know About Criminal Deterrence?*, 100 J. Crim. L. & Criminology 765, 801 (2010) ("Certainty of punishment is generally considered to be more important than the severity of that punishment.").   In fact, "increasing already long sentences," as the government seeks to do here by requesting an additional 5 years, "has no material detrimental effect."  National Research Council, *supra*, at 140.

Longer sentences do not enhance public safety either.  As noted by Dr. Wright:

The logic behind supporting harsher sentences is simple: locking up people for longer periods of time should enhance public safety.  From this view, putting people in prison for years or even decades should prevent offenders from re-offending by

---

[28] https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.

[29] https://www.nap.edu/read/18613/chapter/1.

incapacitating them and/or deterring would-be-offenders from committing crimes. However, contrary to deterrence ideology and "get tough" rhetoric, the bulk of research on the deterrent effects of harsher sentences fails to support these assertions.

Wright, *supra*, at 6 (citing Anthony Doob & Cheryl Webster, *Sentence Severity and Crime: Accepting the Null Hypotheses*, Crime & Justice, 30:143-195, 2003). In fact, longer sentences have actually been found to *increase* recidivism. *Id.* (detailing a substantial meta-analysis of studies and finding that "longer prison sentences were associated with a three percent increase in recidivism").

The Court need not dig through esoteric academic scholarship to find support for the clear premise that longer sentences do not deter crime or increase public safety. The Department of Justice's National Institute of Justice has issued its own guidance reflecting that "[i]ncreasing the severity of punishment does little to deter crime" and "[t]he certainty of being caught is vastly more powerful deterrent than the punishment." *See* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence* 1-2 (May 2016).[30] The reasons for this result are complicated but lay, in part, in recognizing that severe punishment does not "chasten" defendants in the way most people think. "Some policymakers and practitioners believe that increasing the severity of the prison experience enhances the 'chastening' effect, thereby making individuals convicted of an offense less likely to commit crimes in the future." *Id.* "In fact," the Department of Justice notes, "scientists have found no evidence for the chastening effect." *Id.*

Proof of this fact is sadly found just blocks from the courthouse. Mr. Weaver's prosecution

---

[30] https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

comes during a multi-year trend of increased homicides in Baltimore city.[31]  From 2016 to today, the city has seen a staggering 1,663 murders, more still if you include surrounding counties.  This ghastly statistic comes despite decades of coordinated efforts by the U.S. Attorney's Office and States Attorney's Office to jail violent offenders.  From Project Exile to the highly-publicized indictments of various street gangs, there has long been a concerted effort to "incarcerate our way" out of the problem of street-level gang violence.  There have been countless convictions and long sentences at the state and federal level, many noted above.  Yet despite hundreds of millions of dollars spent and the best efforts of thousands of police, agents, and prosecutors, the staggering number of deaths continue unabated.  Stated simply, more jail hasn't stemmed the bloodshed.

The evidence is backed by simple common sense, too.  In the context of this case, neither Mr. Weaver nor others who are similarly situated are likely to be deterred any more if 30 years' imprisonment is imposed over the requested 25 years.  A quarter century is a significant period of time to spend incarcerated away from loved ones, and as long as Mr. Weaver had been alive at the time of the offense.  Meaning that by the time he is released, Mr. Weaver will have spent about half his life in jail, and decades more time in jail than he ever served before.  It belies logic and common sense to believe Mr. Weaver or someone similarly situated to him would be inclined to commit a murder if they believed they would receive 25 years, but disinclined if they thought they'd receive 30.  Simply put, Mr. Weaver must be punished severely for the murder of

---

[31]    As noted, the city saw 342 murders in 2017.  *See* https://homicides.news.baltimoresun.com/?range=2017.  2016 saw 318.  *See* https://homicides.news.baltimoresun.com/?range=2016.  2018 saw a slight reduction to 309.  *See* https://homicides.news.baltimoresun.com/?range=2018.  The number jumped again in 2019 to 348.  *See* https://homicides.news.baltimoresun.com/?range=2019.  2020 was barely better with 335 murders within the city limits.  *See* https://homicides.news.baltimoresun.com/?range=2020.  2021 has thus far seen 11 murders.  *See* https://homicides.news.baltimoresun.com/?range=2021.

Mr. Finney. However, a multitude of data proves that the sentencing goals of deterrence and public safety are fully achieved with a sentence of 25 years.

## RESTITUTION

There are no outstanding issues related to the payment of restitution.

## FINE

Given Mr. Weaver's inability to pay a fine, we respectfully request that the Court not impose a fine.

## SPECIFIC RECOMMENDATIONS

Mr. Weaver does not wish to be housed near Baltimore or at any facility with a high concentration of inmates from Baltimore. He is hopeful that the distance will provide him with a fresh start and a break from any street-related conflict that spills over in the Bureau of Prisons, as he embarks on this next chapter in his life. He requests that the Court recommend designation to **FCI Coleman** (in Florida) in order to participate in their vocational programming, including the advanced culinary training program and the HVAC apprenticeship program. He also hopes to pursue training and classes in creative writing. Mr. Weaver has expressed a willingness to engage in substance abuse and mental health treatment. As such, he requests that the Court recommend placement in the BOP's Residential Drug and Alcohol Treatment Program, and if applicable, the Challenge Program at FCI Coleman.

## CONCLUSION

The loss of Mr. Finney is tragic and merits significant punishment. However, for the reasons noted above and those to be offered at sentencing, the fair and just sentence for Mr. Weaver is one of 25 years (300 months) of imprisonment and 5 years of supervised release.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

_____/s/_____

Brendan A. Hurson (#28179)
Maggie Grace (#29905)
Amy Fitzgibbons (#97952)
Assistant Federal Public Defenders
100 South Charles Street
Tower II, Ninth Floor
Baltimore, Maryland, 21201
(410) 962-3962 (p)
(410) 962-0872 (f)
Email: brendan_hurson@fd.org
       maggie_grace@fd.org
       amy_fitzgibbons@fd.org